**Juan C. Chavez**, OSB #136428
**Franz Bruggemeier**, OSB #163533
**Jonathan Gersten**, OSB #191582
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

    Of Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| TYLER VONTILLIUS, <br><br> Plaintiff, <br><br> v. <br><br> ERIK KAMMERER, CITY OF PORTLAND, and JOHN DOES 1-10, <br><br> Defendants. | Case No. 3:22-cv-00765 <br><br><br> COMPLAINT <br><br> Civil Rights Action (42 U.S.C. § 1983) <br><br> JURY TRIAL DEMANDED |

    For many years, Defendant City of Portland has maintained a pattern and practice of using unlawful force against protesters to chill their speech. This pattern is enforced through action and inaction, affirmative encouragement and acquiescence, and poor training with no discipline. Defendant Kammerer emblemizes this pattern. On June 26, 2020, Defendant Kammerer brutalized Plaintiff Tyler Vontillius (f/k/a, Autumn Vontillius, pending change of name), and other protesters, without probable cause to do so while Plaintiff was speaking out against police violence. Defendant Kammerer attacked Plaintiff not because he had probable

cause, but because he wanted to make protesters hurt and because he knew he would face no discipline for doing so. This attack on protesters serves the ultimate policy goal to extrajudicially punish protesters.

## JURISDICTION

1. This court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983, and 28 U.S.C. §§ 1331, 1343(a)(3), (4). The court has supplemental jurisdiction over the State tort claims pursuant to 28 U.S. Code § 1367(a).

## VENUE

2. Venue is proper within the District of Oregon because all of the events giving rise to this claim occurred in this judicial district, and all defendants reside in this judicial district. 28 U.S.C. § 1391(b). The acts and practices alleged herein occurred in Portland, Multnomah County, Oregon.

## PARTIES

3. Tyler Vontillius (he/him) (f/k/a, Autumn Vontillius, pending change of name), Plaintiff, is a citizen of the State of Oregon.

4. Defendant Erik Kammerer is a detective with the Portland Police Bureau. At all times relevant, Defendant Kammerer was acting under color of law as an agent of the City of Portland, and is sued in his individual capacity.

4. Defendant City of Portland (hereinafter, "City") is a political subdivision of the State of Oregon with the capacity to sue and be sued. The City runs the Portland Police Bureau (hereinafter, "PPB").

5. Plaintiff does not know the names of Defendants John Does 1-10, and thus sues them under fictitious names. John Does 1-10 are any City employees who exercised command

responsibility over, conspired with, aided and abetted subordinates, and/or directly or indirectly participated in Plaintiff's deprivation of civil rights as hereinafter alleged, or furthered the pattern and practice of unconstitutional conduct hereinafter alleged. They are sued in their individual capacities.

## FACTUAL ALLEGATIONS
### I. Introduction: Black Lives Matter.

6. The disproportionate and excessive use of force against Black people by police officers in the United States is a well-documented, systemic problem. It exists in every police department in this country, including the PPB.

7. For many years, advocates and activists have attempted, largely unsuccessfully, to get the City to address and reduce the Portland Police Bureau's disproportionate use of force, stops, searches, seizures, and arrests of Black people, Indigenous people, and people of color. Efforts to address the Portland Police Bureau's racial profiling dates back to the 1990s.[1] And yet, despite all the recommendations, implemented or more often, not, PPB continues to engage in disproportionate targeting of Black people in stops, searches, seizures, and uses of force.

8. On May 25, 2020, in Minneapolis, Minnesota, a Black man named George Floyd was murdered on video by Officer Derek Chauvin of the Minneapolis Police Department while three of his fellow officers watched and did nothing to intervene. Officer Chauvin knelt on Mr. Floyd's neck while Mr. Floyd pleaded for his life, repeatedly telling Chauvin that he could not breathe. A bystander video of the murder quickly went viral, sparking outrage throughout the country.

9. For many Americans, and particularly Black Americans, the murder of George Floyd, in broad daylight while being openly filmed by a witness, was the proverbial straw that broke the

---

[1] https://www.portlandoregon.gov/police/article/32381

camel's back. Fed up with the empty platitudes and the endless yet ineffective "reforms" by their political and law enforcement leaders, millions of Americans took to the streets in protest, demanding an end to police violence and white supremacy, and refusing to leave those streets unless and until meaningful change is made.

10. Protests against police violence have been met with police violence in nearly every city around the country. Videos shared in the press and on social media show the police in this country out of control: attacking journalists, attacking bystanders, threatening children, assaulting people for insulting them, engaging in drive-by attacks with "less lethal" weapons, planting weapons in the hands of people arrested, pulling off demonstrators' CDC-recommended facemasks and macing them, kettling whole groups of protesters only to launch tear gas at them, driving their cars directly through crowds of people, using military helicopters in efforts to terrify civilians, discussing plans to shoot protesters, and above all, using massive amounts of tear gas and impact weapons in a systemic effort to stop people from protesting police violence. This violent police response has only strengthened the resolve of protesters.

11. Beginning on May 29, 2020, Portlanders have been demonstrating in the streets demanding justice for George Floyd and demanding an end to police violence. The PPB, like police departments throughout the country, have met these demands with violence.

12. On June 23, 2021, Mayor Ted Wheeler, who in addition to being the chief executive for the City of Portland is also the PPB's commissioner-in-charge, articulated this policy succinctly as wanting protesters to "hurt."[2]

///

---

[2] Aaron Mesh, *Portland Mayor Wants Reed College to Expel Student If He's Convicted of Smashing Downtown Windows*, Willamette Week (April 23, 2021), https://www.wweek.com/news/city/2021/04/23/portland-mayor-wants-reed-college-to-expel-student-if-hes-convicted-of-smashing-downtown-windows/

## II. PPB's Pattern and Practice of Targeting Police Accountability Protesters

13. On several occasions since 2017, demonstrations in support of police and against the Black Lives Matter movement have occurred in Portland. During these demonstrations, Defendants did not use tear gas, impact munitions, nor any force against these protestors. Instead, PPB provided escorts to maintain the safety and security of these protestors, an accommodation not afforded to those protesting police violence. For example, on August 17, 2019, a group of approximately 500 pro-fascist, pro-police, anti-Black activists from across the country held an unpermitted rally in Tom McCall Waterfront Park in downtown Portland. The stated aim of the rally organizers was to waste city funds and resources. PPB made extensive accommodations for the rally, including closing the Hawthorne Bridge to traffic, erecting concrete barriers around the site of the rally, and placing a heavily armed police presence between the fascist rally and counter protesters. After the far-right rally in Tom McCall Waterfront Park, PPB opened the Hawthorne Bridge for the exclusive use of the fascist rally. PPB declared a civil disturbance after the far-right rally dispersed, ultimately arresting 13 counter protesters. The organizers of the fascist event announced they would return to Portland each month to continue to waste city resources.

14. Likewise, on August 22, 2020, many anti-Black Lives Matter protestors descended on Portland, armed with paintball guns, metal rods, aluminum bats, fireworks, pepper-spray, rifles and handguns in an attempt to intimidate and rally against Black Lives Matter protestors. Defendants did not intervene or arrest these pro-police demonstrators for posing threats to Portland community members. Tusitala "Tiny" Toese, who had an outstanding warrant for his arrest, was present, seen, and identified by Defendants, but not arrested. In contrast, PPB members arrested Demetria Hester, a Black Lives Matter leader, less than two weeks prior.

15. Similarly, on September 26, 2020, a group of approximately 200 pro-fascist, pro-police, anti-Black activists descended on Delta Park for a rally for the express purpose of provoking a violent confrontation with anti-fascist activists. They open-carried firearms within the park, in violation of city code, set up armed check points to control access to the park, and forcibly removed people they decided were not there to support their fascist cause. At least one individual was jumped and given a concussion by the violent mob. At one point, a vehicle arrived and delivered dozens of homemade shields. Despite the presence of dozens of police officers, including PPB "liaison officers" on foot in the park, defendants did not intervene in any way with this criminal activity. On the same day, at the same time, anti-fascist organizers held a rally three miles away in Peninsula Park. That rally was specifically designed to avoid violent confrontations with the fascist rally. No march was planned. Nevertheless, there was a heavy police presence from PPB, and PPB seized homemade shields from participants and arrested individual participants.

### III. PPB's Pattern and Practice of Illegal Use of Force at Protests

16. PPB has a policy or practice of using force without individualized justification to disperse protestors. From May 30, 2020 and onwards, PPB regularly used force consistent with this policy and practice against people like Plaintiff, *i.e.*, without individualized justification to use force. This policy and practice existed to punish people like Plaintiff who wanted to call attention to PPB's rampant lawlessness and violence against the public.

17. Former PPB Chief Jamie Resch stated in a news conference on June 3, 2020 that the decision to use tear gas, other riot control, and "less lethal" weapons against a crowd of protesters the evening prior was made by incident commanders, such as John Does 1-10, at the scene.

18. Nearly a year after protests began, PPB has failed to accurately document or evaluate its officers' use of force against protesters. PPB, including John Does 1-10, has demonstrated that it does not take criticisms of its use of force seriously, and it is unwilling or unable to honestly assess, much less ameliorate, its pattern and practice of unconstitutional use of force against protesters without outside orders or supervision.

19. In an evaluation of PPB's after-action reports (AARs) and other Bureau documentation reviewing and assessing its response to protests between May 29 to November 15, 2020, the attorneys in the U.S. Department of Justice Civil Rights Division ("USDOJ") stated that "PPB's self-assessment insufficiently analyzes its management of force, its members' justifications for force, and the organization's plan to enforce compliance with policy and training. Instead, PPB focuses primarily on external factors beyond its control while over-relying on training and software to address the few faults it is willing to own."

20. PPB broadly portrays all force as justified and evaluated itself as doing an *excellent* job handling the nightly protest.

21. PPB has a pattern of misusing the phrase "active aggression" and "physical resistance" to justify force against individuals who engaged in passive resistance or merely failed to disperse.

22. PPB did not track an inventory of munitions or make a daily count of the type and amount of force used against individuals for most of the summer of 2020.

23. PPB did not assess whether officers violated PPB policies related to using force, reporting force, and reviewing force reports. In its evaluation of use of force at protests, PPB supervisors focus on the articulation of members' justifications for using force, rather than whether a particular use of force was justified.

24. PPB has failed to issue use of force warnings to individuals, or confirm that subjects heard use of force warnings, before using force on protesters.

25. The PPB supervisors assigned to complete AARs had little to no crowd management training.

26. PPB has failed to hold officers, supervisors, and executives accountable for using or approving force without sufficiently articulating a permissible justification.

27. PPB scheduled a Rapid Response Team (RRT) training for April, 2021, and only created lesson plans for parts of the training after DOJ requested copies. PPB ended up cancelling this training because the materials and outlines were insufficient to meet the DOJ's required standards.

28. In the trainings PPB officers did receive, they incorrectly instructed officers to view "slow walkers" as people engaging in physical resistance, and thus subject to physical force including the type of force Plaintiff suffered.

29. PPB treated the failure to disperse as sufficient justification, in and of itself, to use force against protesters. PPB did not engage in individualized assessments of the reasonableness of a particular use of force against a particular person, as required by their PPB Directive 1010 and the U.S. Constitution. Instead, the officers on the ground and their supervising officers believed that a mere failure to disperse, which is only passive resistance, was sufficient to justify the use of force, both targeted and indiscriminate.

30. Ultimately, almost one year after the death of George Floyd, Defendant has failed to acknowledge "the importance of PPB members complying with constitutional standards, adhering to approved policies, and enforcing policy violations." Since May 31, 2020, the City has increased its inventory of crowd control weaponry for use against demonstrators.

31. Defendant Kammerer is a prime example of the City's hands off approach to officer accountability. Defendant Kammerer has a history of violence and unconstitutional force against people involved and around protests both before and after this action.[3] Defendant Kammerer has never been held to account for his actions that violate the Constitution and the public peace. Defendant Kammerer's actions in the present case are consistent with his pattern of brutalizing police accountability protesters. Defendant Kammerer still receives tax-payer dollars to do this.

### IV. Court Orders and Contempt

32. As a result of PPB's lawless uses of force against protesters, Federal and State Courts in Oregon have used their remedial powers to restrain PPB's excesses.

33. The case *Don't Shoot Portland, et al v. City of Portland*, Or. Dist. Case No. 3:20-cv-00917-HZ, was filed on June 6, 2020 directly in response to the opening days of mass police violence in the wake of George Floyd's murder. The Plaintiffs sought and received an injunction placing limits on police use of force at protests shortly after filing their case. The Court later found that PPB's conduct on June 30, 2020 violated the Court's order—specifically owing to the use of impact munitions shot at protesters who were not actively aggressive.

34. Through the *Don't Shoot* litigation, the public learned that PPB had trained their riot police with incorrect use of force standards, such as with citations to opinion overruled in *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) and with incorrect descriptions of protesters walking slowly as "active resistance." One training from 2018 concluded with a slide that caricatured police accountability protesters and advocated for violence against them.

---

[3] Latisha Jensen, *Witnesses and Photos Confirm the Identity of an Aggressive Officer Wearing Helmet Number 67*, Willamette Week (November 4, 2020), available at https://www.wweek.com/news/2020/11/04/witnesses-and-photos-confirm-the-identity-of-an-aggressive-officer-wearing-helmet-number-67/.



35. The case *Index Newspapers LLC, et al v. US Marshals Serv., US DHS, and City of Portland*, Or. Dist. Court Case 3:20-cv-01035-SI was filed on June 28, 2020. The Plaintiffs were non-protesters who were passively observing protests—members of the media, legal observers—who were nonetheless targeted for injury and/or dispersal by PPB. The Court enjoined PPB from this practice.

36. The case *ACLU & Protestor #1 v. City of Portland*, Mult. Co. Cir. Case No. 20CV27116 was filed in July 2020 after it became apparent PPB had been violating ORS 181A.250. That Oregon law prevents law enforcement from surveilling people because of their political activities. The State court enjoined PPB from this practice in September 2020.

37. As partly discussed above, the United States Department of Justice has maintained a quasi-consent decree against the Portland Police Bureau because of its pattern and practice of using excessive force against people with mental illness. *United States v. City of Portland*, Or. Dist. Case No. 3:12-cv-02265-SI. As part of its obligations under the settlement agreement the City had entered into with the USDOJ, PPB had to maintain records regarding its use of force and comply with the U.S. Constitution. The USDOJ found PPB in violation with the settlement

agreement owing to its actions policing protests in 2020 and has sought remedial sanctions against the City of Portland.

38. As described in the preceding paragraphs, numerous courts have found that PPB has violated the law on multiple occasions—acutely so in the summer of 2020, when they injured Plaintiff.

## V. June 27, 2020

39. On the late-evening of June 27, 2020, Plaintiff was present at a protest in Southwest Portland. Plaintiff had been passively protesting in the weeks preceding this night.

40. As with other nights, PPB arrived and chose to confront protesters against police violence with more police violence.

41. Plaintiff was facing northward on SW Third Ave., between SW Main St. and SW Salmon Street. The officers proceeded southward on SW Third Ave. to confront the protesters, including Plaintiff, at around 10:45 to 11:45 pm.

42. Throughout the relevant time period, Plaintiff never engaged in "physical resistance" or "active aggression" against the officers.

43. PPB pepper sprayed and beat some of the protesters with truncheons. Plaintiff remained passive.

44. Then, without warning or reasonable justification, Defendant Kammerer emerges from behind the police line to intentionally knock over several protesters, including Plaintiff. This is caught on video by several videographers present.[4]

---

[4] Mason Lake, *June 27th 11:45 PM 2020 Portland Police Assault on Protesters & Media*, YouTube (June 28, 2020), available at https://youtu.be/k66gQhrY_zo?t=45; EverythingUndertheSun, *June 27th 2020, Portland Oregon, 1035pm PPB, MCSO, Ripping goggles off then pepper spray eyes*, YouTube (June 29, 2020), available at https://youtu.be/EKjWt0_6HIY?t=56.



Figure 1. Plaintiff is in the middle of the frame wearing a white jacket and red bandana.



Figure 2. Defendant Kammerer in center-left of the frame after knocking Plaintiff to the ground.



Figure 3. Defendant Kammerer, far-left frame, knocking over other protesters after attacking Plaintiff.



Figure 4. Defendant Kammerer walking away after brutalizing protesters. His helmet number "67" displayed.

45. After Defendant Kammerer knocked these protesters to the ground, he walked away from the protest line. He never attempted to arrest anyone, including Plaintiff, or de-escalate. He just chose violence. By information and belief, Defendant Kammerer knocked Plaintiff to the ground in retaliation for protesting against police violence that evening, in accordance with Defendant City of Portland's pattern and practice.

46. Plaintiff fell to the ground and hit his head against the pavement. The injury to his head caused pain and constituted a traumatic brain injury. He continues to feel the pain from this incident and the attendant symptoms of a traumatic brain injury. This injury has caused him continued emotional and physical consequences.

### Claim 1: Fourth Amendment – Unlawful Seizure – Individual Liability
### (42 U.S.C. § 1983)

47. It is clearly established law that an officer may not use force that, in light of the circumstances and as perceivable by a reasonable, objective officer, is excessive and unnecessary.

48. In taking the actions described above, including but not limited to seizing Plaintiff and throwing him to the floor without probable cause or other legal justification to do so, Defendant Kammerer intentionally violated Plaintiff's right to be free from unlawful seizures guaranteed by the Fourth Amendment to the United States Constitution.

49. Defendant Kammerer violated rights held by Plaintiff which were clearly established, and no reasonable official similarly situated to Defendant Kammerer could have believed that his or her conduct was lawful or within the bounds of reasonable discretion. Defendant Kammerer therefore does not have qualified or statutory immunity from suit or liability.

50. The actions of Defendant Kammerer, as described in this complaint, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of,

the harm that would be inflicted upon Plaintiff. As a result of his intentional conduct, Plaintiff is entitled to punitive damages against Defendant Kammerer, in his individual capacity, in an amount sufficient to punish him and to deter others from like conduct.

51. John Does 1-10 participated in Plaintiff's injury by failing to train, supervise, and discipline Defendant Kammerer, and/or by directing Defendant Kammerer to brutalize protesters like Plaintiff. Their direct participation in the injury caused Plaintiff's rights to be injured.

52. The unreasonable seizure of Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, anguish, and a traumatic brain injury. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

**Claim 2: Fourth Amendment – Unlawful Pattern and Practice – Municipal Liability**
**(42 U.S.C. § 1983)**

53. As described in Claim 1, Defendants Kammerer and John Doe 1-10 violated Plaintiff's constitutional right to be free from unlawful seizures.

54. The conduct of Defendants Kammerer and John Does 1-10 is illustrative of a pattern and practice of PPB officers violating the Fourth Amendment rights of individuals at protest demonstrations countering white supremacist groups and/or police misconduct.

55. Defendant City of Portland does not have adequate supervisory review of incidents where officers use force that would correct patterns of unlawful actions by PPB officers in a timely or effective fashion, and rarely categorizes such unlawful seizures as out of policy even when the force is clearly excessive or when the arrest was without sufficient legal justification. Defendant Erik Kammerer received inadequate training, supervision, and/or discipline for violating the U.S. Constitution. Defendant City of Portland has effectively condoned this practice by repeatedly failing to correct constitutional violations by officers throughout the PPB.

56. Defendants City of Portland and John Does 1-10 failed to train and discipline its officers, including Defendant Kammerer, and failed to follow the protections against these types of police and government repression and retaliation that have been recognized under the U.S. Constitution, as described above. As a result, Defendant Kammerer engaged in unconstitutional conduct that resulted in harm to Plaintiff.

57. The unreasonable seizure of Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, anguish, and a traumatic brain injury. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

**Claim 3: First Amendment — Unlawful Retaliation Against Speech — Individual Liability (42 U.S.C. § 1983)**

58. As described above, Defendants targeted Plaintiff for injury not because they had probable cause or other justification for lawful force, but because they took offense to Plaintiff's speech activity.

59. The First Amendment protects persons from unlawful curtailment of expressive conduct, assembly, and associations with one another.

60. Defendant Kammerer and John Does 1-10's retaliatory motive was the but-for cause of Plaintiff's injuries. By shoving and injuring Plaintiff, Defendants chilled Plaintiff's political speech, violating his First Amendment rights.

61. The retaliation against Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, anguish, and a traumatic brain injury. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

**Claim 4: First Amendment – Unlawful Pattern and Practice – Municipal Liability**

**(42 U.S.C. § 1983)**

62. As explained in Claim 3, Defendants Kammerer and John Does 1-10 violated Plaintiff's constitutional speech rights.

63. Defendants Kammerer and John Does 1-10's conduct, and the conduct alleged in paragraphs 6 to 38, is illustrative of a pattern and practice of PPB officers violating the First Amendment rights of individuals at protest demonstrations against police misconduct. Defendant City of Portland has a custom and practice of using militarized force against left-wing or antifascist protestors. Defendants' past Fourth and First Amendment violations were intended to punish a group of protestors *en masse* for their political speech. Defendant City of Portland does not use such tactics against right-wing protestors or fascist protestors, such as the Proud Boys or Patriot Prayer, despite their disobedience of officers' orders and clear intent to terrorize the community of Portlanders.

64. The retaliation against Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, anguish, and a traumatic brain injury. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

**REASONABLE ATTORNEY'S FEES AND COSTS**

65. 42 U.S.C. § 1988(b) allows "the prevailing party… a reasonable attorney's fee as part of the costs…" in an action brought under 42 U.S.C. § 1983.

66. Plaintiff requests that the Court grant a reasonable attorney's fee in this action.

**CONCLUSION**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

    A.    For economic and non-economic damages in an amount to be determined at trial;

B.     For reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988; and

C.     Such other relief as the court deems just and proper.

DATED: May 25, 2022

*/s/ Juan C. Chavez*
Juan C. Chavez, OSB #136428
Franz Bruggemeier, OSB #163533
Jonathan Gersten, OSB #191582
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208

*ATTORNEYS TO BE NOTICED*